IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Clinton Properties, Inc. and : 
Pioneer Aggregates, Inc., : 
                Appellants : 
            v. : No. 283 C.D. 2024
  : 
Fell Township Zoning Hearing Board : Argued: April 8, 2025
and Fell Township : 


BEFORE:    HONORABLE PATRICIA A. McCULLOUGH, Judge
              HONORABLE STACY WALLACE, Judge
              HONORABLE MARY HANNAH LEAVITT, Senior Judge

***OPINION NOT REPORTED***

MEMORANDUM OPINION
BY JUDGE McCULLOUGH              FILED: February 3, 2026

Clinton Properties, Inc. and Pioneer Aggregates, Inc. (collectively Appellants) appeal from a February 8, 2024 decision of the Court of Common Pleas of Lackawanna County (trial court) affirming the December 15, 2021 decision of the Fell Township (Township) Zoning Hearing Board (ZHB). In its decision, the ZHB denied Appellants' appeal of a notice of violation or enforcement notice (Notice) sent to Appellants for alleged violations of the Township Zoning Ordinance (2002 Zoning Ordinance or Ordinance). After review, we affirm.

## I.   Factual and Procedural Background

Appellant Clinton Properties, Inc. is the current owner of an approximately 700-acre parcel of property (the Property) located in the Township that it acquired in April of 1991. (Reproduced Record (R.R.) at 3a.) Appellant Pioneer Aggregates, Inc. currently leases the Property and has leased it since it was

acquired by Clinton Properties.  *Id.* at 2a-3a.  The Property is located in an S-1 Conservation Zone, which is identified as a "Conservation District."  The Township strictly limits the activities or uses that it allows in its S-1 Conservation zones.[1] Section 9.210 of the Township's 2002 Zoning Ordinance provides that "[n]o person shall . . . alter the use of any land. . . until a Zoning Permit has been issued by the Zoning Officer."[2]  (2002 Zoning Ordinance at Section 9.210; R.R. at 201a.)

In the past, portions of the Property have been used for the purpose of surface mining or operating a rock quarry.  While mining is not generally allowed in an S-1 Conservation Zone, Appellants were able to engage in this activity after obtaining permits from the Pennsylvania Department of Environmental Protection (PA DEP) in approximately 1991 as well as a special exception[3] from the ZHB which they acquired at roughly the same time.  (R.R. at 203a, 240a.)  The PA DEP

---

[1] The Township's 2002 Zoning Ordinance divides the Township into eight zoning districts, differentiated according to building regulations and permitted uses.  (2002 Zoning Ordinance at Section 2.100.) (Original Record (O.R.) at Exhibit T-14, p. 2-1.)  (Certain portions of the Zoning Ordinance are not in the reproduced record but are in the original record.)  Section 2.400 of the Ordinance ranks the zones according to their degree of restrictiveness.  Of the eight zones specified in the Ordinance, only the R-1 and R-2 Residential Zones are more restrictive than the S-1 Conservation Zone.  (R.R. at 210a-11a.)  The area where the Property is located has been zoned S-1 at least since 2002, when the Township issued its 2002 Zoning Ordinance.  The area continues to be zoned S-1.  (ZHB decision, Finding of Fact (F.F.) 2; R.R. at 3a, 27a.)

[2] The Ordinance also provides that "[w]here a use is specifically enumerated in a less restrictive zone, such use shall not be permitted in a more restrictive zone unless it is specifically enumerated as a permitted use therein."  (2002 Zoning Ordinance, Section 2.400(c); R.R. at 210a-11a.)

[3] "A special exception is not an exception to the [] Ordinance, but rather a use which is expressly permitted, absent a showing of a detrimental effect on the community.  *Manor Healthcare Corporation v. Lower Moreland Township Zoning Hearing Board*, 590 A.2d 65, 70 (Pa. Cmwlth. 1991) (citations omitted).  "The applicant for a special exception has both the duty of presenting evidence and the burden of persuading the [ZHB] that the proposed use satisfies the objective requirements of the ordinance for grant of special exception."  *Id.*

permits were issued pursuant to the Pennsylvania Noncoal Surface Mining Conservation and Reclamation Act[4] (Noncoal Act) and the Surface Mining Conservation and Reclamation Act (Surface Mining Act).[5] No time limit was placed on the ZHB's special exception. (R.R. at 239a.) On November 3, 2007, the PA DEP reissued Appellants' permit under the Noncoal Act. (R.R. at 138a.) The reissued permit stated that it "shall not be construed to sanction any act otherwise forbidden by federal or state law or regulation, or by local ordinance, nor to [preempt] any duty to obtain state or local assent required by law for the noncoal mining activity." (R.R. at 140a.) It also stated that "nothing in this permit shall be construed to relieve the permittee from any responsibilities, liabilities, or penalties to which the permittee may be subject under federal, state, or local laws." *Id.*

On July 11, 2016, Appellants applied to PA DEP for a Demonstration Facility Permit[6] (Demonstration Permit) authorizing the use of approximately 2.5 acres of the Property for a demonstration project. The 2.5 acres is part of a larger area covered by their Noncoal Act permit. (F.F. No. 3; Supplemental Reproduced Record (S.R.R.) at 40b-41b.) On September 21, 2017, PA DEP's Bureau of Land Recycling & Waste Management issued Appellants' requested Demonstration Permit allowing them to begin operations "based on a new or unique technology for

---

[4] Act of December 19, 1984, P.L. 1093, *as amended*, 52 P.S. §§ 3301-3326.

[5] Act of May 31, 1945, P.L. 1198, *as amended*, 52 P.S. §§ 1396.1-1396.19b.

[6] On August 15, 2016, PA DEP issued a correction to Appellants' Noncoal Act permit to add the location of the demonstration project. (R.R. at 167a.) The Demonstration Permit states that it does not authorize any activity on the permit issued under the Surface Mining Conservation and Reclamation Act.

disposing of municipal waste."[7] (F.F. No. 7.) Appellants, however, did not obtain a special exception from the Township for the use of the Property to operate the Demonstration Facility, which the Township alleges is a violation of Section 9.210 of the 2002 Zoning Ordinance which requires a Zoning Permit from the Township Zoning Officer before the use of land in the Township is altered. (R.R. at 201a.)

The PA DEP's Demonstration Permit described the newly permitted activity, which involved the mixing of a waste product known as C&D fines in a pugmill with water and cement to achieve a mixture consisting of 6% Portland cement. (F.F. No. 4.) The resultant product creates a lightweight concrete which Appellants planned to place in a quarry hole on the Property. (F.F. Nos. 6, 7, 10.) The purpose for creating the product was to produce a material with limited permeability and sufficient strength to support re-use of the quarry for light commercial/industrial development. (F.F. No. 11.)

The new Demonstration Permit allowed the demonstration project to operate for a fixed term not to exceed one year from the date of construction certification. (R.R. at 77a.) The project's approved capacity was 90,000 cubic yards. The permit also stated that it was conditioned on compliance with the Pennsylvania Solid Waste Management Act. 35 P.S. §§ 6018.101-108, and other statutes regulating municipal waste including the Municipal Waste Planning, Recycling and Waste Reduction Act, 53 P.S. §§ 4000.101-104, the Clean Streams Law, 35 P.S. §§ 691.1-691.1001, and the Air Pollution Control Act, 35 P.S. §§ 4001-4015. (R.R. at 90a.) It further stated that "[n]othing in this permit shall be construed to supersede, amend or authorize violation of the provisions of any valid and applicable local law, ordinance or regulation, provided that such local law, ordinance or regulation is not

---

[7] The Demonstration Permit stated that "[t]he demonstration is for processing of construction & demolition waste fines (C&D fines) to produce Re-Crete, and the placement of Re-Crete to reclaim a portion of the Simpson Quarry." (R.R. at 89a.)

4

preempted by the Pennsylvania Solid Waste Management Act and the Municipal Waste, Planning, Recycling and Waste Reduction Act." (R.R. at 91a.)

On August 15, 2016, PA DEP issued a correction to Appellants' permit issued under the Pennsylvania Noncoal Surface Mining Conservation and Reclamation Act (Non-Coal Surface Mining permit) to add the location of the Demonstration Facility to the Surface Mine permit.[8] (R.R. at 167a.) On March 29, 2018, PA DEP issued an additional permit modification/correction to Appellants' Surface Mining Permit. This permit modification contained the following Special Condition:

> If odor and/or vector control problems become evident at any time, the Department will require that all corrective measures, including removal of any and all Recrete material, be initiated immediately upon notice of the Department. If the problems cannot be corrected or remediated on a consistent basis, the Department reserves the right to rescind this approval/permit correction.

(R.R. at 175a.)[9]

Also in 2018, Petitioners filed with the ZHB an application entitled "Application of Simpson Stone Quarry for Change in Use in Relation to the Backfill and Reclamation of Disturbed Areas." (R.R. at 18a, 21a-24a.) On December 12, 2018, the ZHB held a hearing to consider this application; however, neither Mark

---

[8] This permit contained Special Conditions, which included No. 9, "The reclamation plan for this operation is approved with an option for reclamation with clean fill" and No. 10, a statement that the modification was "for establishing the location only for the proposed Demonstration Facility" and that "[t]he installation and operation of the Demonstration Facility is contingent upon final approval by the NERO's Waste Management Program." (R.R. at 169a.)

[9] The March 29, 2018 modification also stated that "[t]he reclamation plan for this operation is approved as a water impoundment with an option for reclamation with Mine Reclamation Fill." (R.R. at 175a.)

Popple, a representative of Appellant Clinton Properties, nor his attorney attended the hearing.[10]  *Id.* at 18a-19a.  At the hearing, the Chairman stated that he had received a letter on December 12, 2018, from Mr. Popple indicating that he had withdrawn his application for a use variance for the Property and that he would not be attending the hearing.  *Id.* at 23a.[11]

Appellants began processing C&D fines to produce the lightweight concrete mixture on the Property on or about June 12, 2019, and continued their activities until approximately June 12, 2020.  *Id.*  On January 1, 2020, Appellants entered into a new lease under which the previous lease was modified to reflect that the rental payments paid by Pioneer Aggregates to Clinton Properties from then on would be based on a per-ton fee paid by third-party waste transporting and processing facilities who wish to deposit C&D fines on the site.  (F.F. Nos. 9, 15; S.R.R. at 1b-5b.)  During the year that the demonstration project was in operation, the site did not reach the maximum limit allowed by the Demonstration Permit of 90,000 cubic yards of C&D fines.  (F.F. No. 18.)

On January 16, 2020, the Township issued a Notice to Appellants regarding the activities occurring on the Property.  (R.R. at 199a.)[12]  On November 2, 2020, the Township enacted a new zoning ordinance (2020 Zoning Ordinance) which repealed the previous 2002 Zoning Ordinance.  Thereafter, on November 30,

---

[10] The hearing was a continuation of a previous hearing held on November 7, 2018.

[11] Because the application had been withdrawn, the ZHB closed the hearing without taking witness testimony, but did accept input offered by the meeting attendees.  (R.R. at 24a.)

[12] Appellants suggest that the January 16, 2020 Notice was the second of three Notices that they received.  (Appellants' Br. at 14) ("Triggering this current case was a [t]hird [Notice of Violation] of November 30, [2020] by Fell to Pioneer.")  Appellants assert in their brief that they also received a Notice from the Township dated June 13, 2019.  (Appellants' Br. at 37.)

2020, the Township withdrew and replaced its January 16, 2020 Notice because the Township's Zoning Officer who had issued the earlier Notice was no longer employed by the Township. (R.R. at 199a.) Both Notices were issued with respect to alleged violations of the Township's 2002 Zoning Ordinance occurring on the Property while the 2002 Zoning Ordinance was in effect. *Id*.

The Notice informed Appellants that their use of the Property under the Demonstration Permit constituted activity that did not fall within the parameters of Appellants' special exception for mining uses. It informed them that they were required to obtain a special exception and a permit from the Township to allow the new uses. (R.R. at 199a-202a.) The Notice explained that

> **[t]he new use constitutes a Solid Waste Disposal Area (Sanitary Landfill),** which is regulated under Section 5.90 of the [2002 Zoning Ordinance] and is permitted in the I-1 Zoning District,[13] not the S-1 [Conservation Zone]. (citation omitted.) Moreover, Section 2.400(c) of the [] [2002 Zoning Ordinance] states that "where a use is specifically enumerated in a less restrictive zone, such use shall not be permitted in a more restrictive zone unless it is specifically enumerated as a permitted use therein." Furthermore, Section 2.500 of the [] [2002 Township Zoning Ordinance] only permits listed uses and no other uses in the zone where the [Property] is located. Therefore, a use variance is required for the new use.

(R.R. at 200a.) (emphasis added).

The Notice further stated that the activity being conducted on the Property also constitutes **a manufacturing use** under the 2002 Zoning Ordinance. It stated that while "there is no such term defined in the [] Township Zoning Ordinance, Merriam-Webster dictionary defines manufacturing as '*the act or*

---

[13] The I-1 Zoning District allows industrial uses to be carried out within its confines. *See* 2002 Zoning Ordinance, O.R. at T-14, p. 2-1.

7

*process of producing something.*'" (R.R. at 201a.) (emphasis in original) The Notice then stated that the North American Industrial Classification System (NAICS) also defines a manufacturing use as "[*e*]*stablishments engaged in the mechanical, physical, or chemical transformation of materials, substances, or components into new products.*" *Id.* (emphasis in original)

According to the Notice, a manufacturing use, like a Solid Waste Disposal Area (Sanitary Landfill) (landfilling), is not permitted in any zoning district other than the I-1 Industrial District and is not permitted in the S-1 Conservation Zone. Therefore, because neither use of the Property was permitted in an S-1 Conservation Zone, use variances were required before Appellants could engage in the activities or uses now being carried out under the Demonstration Permit. *Id.* The Notice further informed Appellants that a zoning permit was also required for these uses of the Property but that such a permit would not be issued until the use variances were first granted by the ZHB. Appellants were given 30 days to complete the enclosed Zoning Permit Application and return the application and applicable fee. (R.R. at 201a-02a.)

Appellants timely appealed the Notice to the ZHB, which held 17 hearings for the purpose of taking testimony and receiving documentary evidence relating to Petitioner's appeal.[14] (R.R. at 2a.) The ZHB held a hearing on July 29, 2021, to consider Appellants' appeal. At the hearing, Roger Bellas, a representative of PA DEP, explained that under Section 271.501 of the PA DEP's regulations governing Municipal Waste Processing or Disposal Facilities, 25 Pa. Code

---

[14] The ZHB held hearings on February 25, 2021, February 26, 2021, April 18, 2021, June 22, 2021, June 23, 2021, July 19, 2021, July 29, 2021, August 2, 2021, August 5, 2021, August 25, 2021, August 26, 2021, September 2, 2021, September 9, 2021, September 20, 2021, September 23, 2021, September 30, 2021, and November 4, 2021. (R.R. at 2a.)

§ 271.501,[15] the Demonstration Permit issued to Appellants allows for the operation of municipal waste or disposal facilities based on a new or unique technology for processing or disposing of municipal waste. (ZHB Finding of Fact (F.F.) No. 7; R.R. at 4a.) Mr. Bellas agreed with counsel that it would "be a fair characterization that for purposes of the demonstration permit we're talking about a new use[]." (R.R. at Item 8, N.T. at 10.) He further testified that he considers the product created by the mixing of cement, C&D fines, and water to constitute the manufacture of a new product and he agreed with the following statement: "So by bringing in this waste and mixing it with Portland cement, in [PA] DEP's definition it creates a new product?" (R.R. at Item 8, Notes of Testimony (N.T.), at 10, 87.) Finally, he also stated that in his opinion the material they are dealing with for purposes of the demonstration facility is municipal waste and the facility being operated under the Demonstration Permit is a waste processing facility. *Id.* at 10, 86. Similarly, Mr. Popple testified before the ZHB that the purpose of the Demonstration Permit was to demonstrate a new use and that he had not used the material now being used on the Property to reclaim other pits in the state. (S.R.R. at 36b-37b.)

---

[15] Section 271.501 provides:

> This subchapter applies to municipal waste processing or disposal facilities, or parts of these facilities, that are based on a new or unique technology for processing or disposing of municipal waste. For purposes of this subchapter, a technology is considered new or unique if it has not previously been demonstrated in this Commonwealth or another comparable area. The Department may approve in writing, as a permit modification, the demonstration of new or unique technology for the processing or disposal of municipal waste at permitted municipal waste processing or disposal facilities if the requirements of this subchapter are met.

25 Pa. Code § 271.501.

During the hearing, the Township presented the expert testimony of Thomas Shepstone, a municipal planner, with extensive experience in the drafting and interpretation of municipal zoning ordinances, and received Mr. Shepstone's expert report. Mr. Shepstone reviewed the evidence and concluded that the disposal of C&D fines and the mixing of them with water and Portland cement was a new use at the site. He testified that the activities constituted a landfilling use. He defined a "Sanitary Landfill" as an engineered land burial facility for the disposal of household waste that is designed, constructed, and operated to contain and isolate the waste so that it does not present a substantial present or potential hazard to human health or the environment. He also stated that a sanitary landfill may receive other types of solid waste, such as commercial solid waste, nonhazardous sludge, construction demolition debris, and nonhazardous industrial solid waste. In his expert report, he stated that the activity taking place on Appellants' property made use of a liner system. He stated that in his opinion, the use occurring at the Property constituted a sanitary landfill under the 2002 Zoning Ordinance, and this use was not permitted in an S-1 Conservation Zone. Mr. Shepstone also testified that Appellants' production of the C&D fines and cement mixture at the site was a product manufacturing process, and that manufacturing also was not a permitted use in an S-1 Conservation Zone. (F.F. No. 21.)

The ZHB also heard expert testimony from John R. Varaly, a municipal planner and received Mr. Varaly's Expert Witness Report. (F.F. No. 22; R.R. at 162a-66a.) According to Mr. Varaly, the Demonstration Permit authorized the processing of C&D fines with Portland cement for the sole purpose of reclamation of a portion of the site. He also asserted that reclamation is an essential component of the operations of noncoal mining. Therefore, he argued that the use Appellants were making under the Demonstration Permit was not a new use, but rather a use connected with mining, for which Appellants had a special exception from the

10

Township, and therefore the use did not violate the 2002 Zoning Ordinance. (R.R. at 162a.)

An additional witness for Appellants, Kathryn Murray, testified regarding the process for producing the mixture of cement and C&D fines, and that the product being produced under the Demonstration Permit could be used for mine reclamation. (S.R.R. at 15b-16b, 20b-21b, 23b-24b.)

### *The ZHB's Decision*

On December 15, 2021, the ZHB issued its decision, containing the following pertinent Findings of Fact:

> . . . .
>
> . . . .
>
> 3. The [A]ppellant, Pioneer Aggregates, Inc.[,] applied for a permit with the Pennsylvania Department of Environmental Protection (PA DEP) for a **Demonstration Facility Permit** for use of approximately 2.5 acres of land for a demonstration project as described in the Application document which is Pioneer Exhibit 65. The date of the Application is July 16, 2016.
>
> 4. On September 21, 2017, PA DEP granted the permit for the demonstration project. The PA DEP granted a Municipal Waste Demonstration Permit: Permit Number 101713. The permit allowed for the: "**processing of C&D fines and placement of Re-Crete**. Re-Crete is a material formulated by blending Portland Cement and C&D fines in a pugmill to achieve a mixture of 6% Portland cement." The permit **limited activities to a 2.5-acre site** on the property as shown on a map that was attached as an exhibit to the application. The approval letter is Exhibit 13 submitted by Fell Township.
>
> . . . .

11

6. The [A]ppellant, Pioneer Aggregates, Inc.[,] presented evidence from an engineer, Kathryn Murray. This testimony established that the site of the demonstration project was located within a larger area previously licensed by PA DEP under a non-coal surface mining permit. 9/2/21. Transcript; p.4. The **process for producing the Re-Crete product** is described in the testimony of Kathryn Murray as mixing C&D fines with Portland cement. This is also explained in the application for the demonstration permit which is Pioneer Exhibit 65. The process was also explained by Mr. Popple; Transcript 7/29/21, p. 29. The fines are mixed with water and Portland cement and loaded into a hopper which is part of the pugmill. The water is located in an underground storage tank. The **mixture** of water, C&D fines and Portland cement are controlled by a computer which ensures a consistent product. The **produc**t which is produced is tested at the site to determine if it complies [with the] parameters for the product. 9/2/21 Transcript; p. 74-76; 91-95. The resultant product **creates a lightweight concrete**. 9/2/21 Transcript p. 100. See also 9/09/21 transcript; p. 108-111[.]

7. The Municipal Waste Demonstration Permit which was obtained by Pioneer Aggregates was explained by Mr. Roger Bellas of Pa DEP. He stated that Section 271.501 of Chapter 25 of the Pa. Code stated that the permit applies to municipal waste processing or disposal facilities that are based on a **new or unique technology for processing or disposing of municipal waste**. This was confirmed by Mr. Popple; 7/29/21 Transcript; p. 8-9.

8. The produce created by the mixture of cement, C&D fines and water is **considered by PA DEP to be a new product;** 8/02/2021 Transcript; p. 87. The mixture of Portland cement and C&D fines binds any potential contaminants and adds to its impermeability. The PA DEP categorized this activity as **waste processing** and the operation is categorized as a **waste processing facility**; 8/02/21 Transcript; p. 86.

9.  The [A]ppellant, Pioneer Aggregates, Inc.[,] planned to **place the new product in a quarry hole** which existed on the property of Clinton Properties, Inc.   Pioneer Aggregates, Inc. and Clinton Properties, Inc. created a **new lease** which provided in part that Clinton Properties, Inc. would receive a **royalty** for each ton of C&D fines delivered to the property for use in the process.  7/28/21 Transcript p. 44.

10.  Once the **new product is produced**, it is **tested** for compaction, strength and permeability.  The tests are required by the PA DEP permit 7/29/21[,] Transcript p. 66-67.  The standards of **compliance for the product** are set forth by PA DEP; 8/26/21 Transcript p. 4-5.

11.  The **purpose** of the formulation of the product was to **create a product** that would provide adequate strength and have limited permeability to **support re-use of the quarry for light commercial/industrial development.** 8/26/21 Transcript p. 21.

12.  The **NAICS code** was entered into evidence.  Pioneer Aggregates, Inc. Exhibit 54.   The definition of manufacturing states: "The **Manufacturing** sector comprises establishments engaged in the **mechanical, physical, or chemical transformation of materials, substances, or components into new products**."

13.  C&D fines were described as material generated from construction and demolition projects.  The C&D fines are mostly generated from demolition projects and contain numerous waste products from this activity.  7/29/21 Transcript p. 29-31.  C&D fines are classified as waste products; 8/02/21 Transcript p. 10.  The C&D fines are mixed with a 6% mixture of Portland cement and water to form the new product.

. . . .

13

15. The **C&D fines were delivered** to the site by waste transporting and processing facilities which paid a **fee** to **deposit** the C&D fines at the Clinton Properties, Inc. property based upon the tonnage deposited at [t]his site.

16. The Municipal Waste Demonstration Permit Facility ID#101713 was issued on September 21, 2017 by the PA DEP and signed by Roger Bellas, Environment Program Manager. The term of the **permit** [] is **5 years**. The permit provided for specific terms and conditions for the depositing of the C&D fines. The **maximum limit** for depositing fines was up to 90,000 cubic yards. There were conditions precedent in the permit which had to be satisfied by the applicant, Pioneer Aggregates, Inc. before the processing of the waste C&D fines could be commenced. Township Exhibit 13.

17. One of the **conditions** precedent was the **modification of a prior non-coal mining permit #35030301 and an Anthracite Coal Surface mining Permit, Permit Number 35910101 to allow for the work to be performed at a Pre-Act Pit.** This approval was granted by PA DEP. Pioneer Aggregates, Inc. did identify in detail the process for disposal of the waste; Township Exhibit 18. The application specifically stated that waste hauling vehicles would access the facility via SR 171 and all incoming vehicle[s] would be directed to a scale for weighing of the waste. The waste was then to be unloaded and inspected. Township Exhibit 15 and Pioneer Aggregates, Inc. Exhibit 65

. . . .

19. The Demonstration Permit Application describes the **liner system** which was **installed** at the site as a **prerequisite to operation** of the process. The primary liner and the requirements for the bed of the liner were specifically set forth in the application and were imposed as a requirement for the permit when approved.

14

20. The **Operation Plan, Phase II**, of [] Form 14 of the Demonstration Permit classifies the type of facility as a "**Construction/Demolition Waste Landfill**."

21. Fell Township did present the expert testimony of Thomas Shepstone who is a municipal planner with extensive experience in the drafting and interpretation of municipal zoning ordinances. Mr. Shepstone evaluated extensive evidence and concluded that the disposal of C&D fines and the production of the mixture of C&D fines with Portland cement and water were [] a **new use** at this site. Fell Township Exhibit 12. This expert witness opined as follows:

A. The 2002 Zoning Ordinance defined a Sanitary Landfill as: "any facility devoted to the storage and/or disposal of solid wastes pursuant to the regulations of the [PA DEP] governing sanitary landfills." However, there is no such term in the PA DEP regulations. Mr. Shepstone [] relied upon the definition in a recognized authoritative source, the Merriam-Webster Dictionary.

B. The definition used by Mr. Shepstone defined a sanitary landfill as: "Sanitary Landfill means an engineered land burial facility for the disposal of household waste that is so designated, designed, constructed, and operated to contain and isolate the waste so that it does not become a substantial present or potential hazard to human health or the environment. A sanitary landfill also may receive other types of solid waste, such as commercial solid waste, nonhazardous sludge, hazardous waste from conditionally exempt small quantity generators, construction demolition debris and nonhazardous industrial solid waste."

C. Mr. Shepstone opined that the **new use was a "sanitary landfill"** under the terms of the 2002 Fell Township Zoning ordinance which was not permitted in an S-1 zone.

D. The 2002 **Zoning Ordinance** of Fell Township **did not contain a definition for the term "manufacturing."** Mr. Shepstone relied upon the **North American Industrial Classification System definition.**

15

The system is relied upon by PA DEP for classification of activities and was adopted by the United States Office of Management and Budget and accepted as a source for classification of commercial activities; Pioneer Exhibit 54. Mr. Shepstone opined that the production of the C&D fines mixture utilized by the Appellants was a **product manufacturing process at the site which was not a permitted use in an S-1 zone.** Fell Township Exhibit 12.

22. The **Appellants** presented testimony from John R. Varaly, a municipal planner, who also submitted a report. Pioneer Exhibit 63. Mr. Varaly **opined** in his testimony and his report that the use described involving the processing of the C&D fines was **not a new use.** This opinion **did not address the testimony of Mr. Popple or Mr. Bellas noted above and importantly did not consider the project description or the PA DEP regulations which governed the Municipal Waste Demonstration Permit which was granted to the Appellant for use of this product based on the assertion by the Appellant and requirements of the regulation that this process was a new use.**

23. On November 30, 2020, the Fell Township Zoning Officer issued an Enforcement Notice/Notice of Violation to Clinton Properties, Inc. and Pioneer Aggregates, Inc. which alleged that the process of creating the mixture of Portland cement, C&D fines and water to deposit in an existing quarry pit was a new use and violated the provisions of the Fell Township Zoning Ordinance of 2002.

(F.F. Nos. 3, 4, 6-13, 15-23) (emphasis added).

The ZHB's decision then set forth the following pertinent Conclusions of Law (COL):

. . . .

16

5. The law of the Commonwealth of Pennsylvania requires that the definition of a use as defined by a zoning ordinance must be construed expansively so as to afford a landowner the broadest possible use and enjoyment of his land. *Rabenold v. Zoning Hearing Board of Palmerton Township*, 777 A.2d 1257 (Pa. Cmwlth. 2001).

6. The [ZHB] must also consider the primary objective of the zoning ordinance by considering the intent of the legislative body that enacted the ordinance. *THW Group, LLC v. Zoning Board of Adjustment*, 86 A.3d 330 (Pa. Cmwlth. 2014).

7. Determinations as to credibility of witnesses and the weight to be given to the evidence are matters to be left to the [ZHB] in performance of its fact-finding role. *Borough of Youngsville v. Zoning Hearing Board of Youngsville*, 450 A.2d 1086 (Pa. Cmwlth. 1982). The [ZHB] may elect to disbelieve a witness even if the witness is uncontradicted. *Roseberry Life Insurance Company v. Zoning Hearing Board of the City of McKeesport*, 664 A.2d 688 (Pa. Cmwlth. 1995); *Collier Stone v. Zoning Hearing Board of Collier Township*, 710 A.2d 123 (Pa. Cmwlth. 1998).

. . . .

9. The [ZHB] has determined that the use identified in the Notice of Violation and the **evidence presented during the hearings is a new use** which commenced in June of 2019 and was **not a nonconforming use** that came into existence prior to the enactment of the 2002 [] Zoning Ordinance.

. . . .

11. The Zoning Hearing Board determines that the **purpose** of the identified process using a mixture of C&D fines, Portland Cement and Water mixed by a computerized machine and tested for compaction, strength

17

and permeability is to **create and test a product for its potential use in a variety of commercial applications**.

. . . .

15. The Zoning [Hearing] Board concludes that the new use constitutes a **manufacturing use** under the applicable Fell Township Zoning Ordinance. Although there is not a defined term in the definitions section under the Fell Township Zoning Ordinance, the Merriam-Webster dictionary defines manufacturing as "the act or process of producing something." The North[] American Industrial Classification System **(NAICS)** also defines a manufacturing use as "Establishments engaged in the mechanical, physical, or chemical transformation of materials, substances, or components into new products." The **new use of the Appellants produces a material which is designed to meet certain parameters for compaction, strength and permeability**. This new product has been created for various applications. This manufacturing process is allowed in the I-1 Zoning District, not the S-1 Zoning District. See Article 3, Table 1 of the Fell Township Zoning Ordinance of 2002. Moreover, Section 2.500 of the Fell Township Zoning Ordinance only permits listed uses and no other uses, and Section 2.630 of the Fell Township Zoning Ordinance serves to require compliance with these restrictions.

(COL Nos. 5-7, 9, 11, 15) (emphasis added.)

The ZHB further concluded that Appellants' activities on the Property also constituted a "Sanitary Landfill" and that "the [2002] Zoning Ordinance regulates 'Solid Waste Disposal Areas (Sanitary Landfills)' under Section 5.590, defining Solid Waste under [the] Definitions Section." (COL No. 16.) It then noted that the Ordinance's definition was based on the PA DEP regulations, which did not contain a definition for sanitary landfills. The ZHB therefore turned to the dictionary definition relied upon by Mr. Shepstone in his testimony. (COL No. 16.)

18

Using this definition, the ZHB concluded that "the new use which is classified as a Solid Waste Disposal Area (Sanitary Landfill) under the terms of the 2002 Zoning Ordinance [] is not permissible in an S-1 Conservation Zone and this activity is prohibited at the site." (COL No. 17.)

With respect to the use made of the Property under the Demonstration Permit, the ZHB concluded as follows:

18. The Appellants did contend that the use of producing the concrete product on site was a pre-existing nonconforming use. It was asserted that the production of the product for placement in the Pre-Act pit qualified the use as an act of reclamation as required by the above identified mining statutes and was therefore a pre-existing use.

19. The [ZHB] has determined that the creation of the lightweight concrete product produced at the site and the use of the Pre-Act pit for testing of this product for this use is new to this site and, therefore, was not a nonconforming use at this site. The law of this Commonwealth directs that the landowner has the burden of proof to prove that the use pre-existed the enactment of the Zoning Ordinance. **The case of *Collier Stone v. Zoning Hearing Board of Collier Township*, 710 A.2d 123 (Pa. Cmwlth. 1998) is directly on point. In this case a quarry presented evidence that it had accepted concrete at the site and requested a permit to produce precast concrete products. This permit was denied by the municipality. The zoning hearing board considered the appeal of the landowner. It was determined that the manufacturing use of creating precast concrete products was not a pre-existing use even if concrete was used in prior quarry operations. The manufacture of a concrete product was distinct from quarry operations even if concrete was previously used in the operation.**

19

20. The [ZHB] in this case has determined that the previous existence of the quarry did not incorporate the identified manufacturing use. The claim of a pre-existing nonconforming use was not established by Appellants and their claim for this status is denied by the [ZHB].

(COL Nos. 18-20) (emphasis added).

In addition, the ZHB concluded:

10. The [ZHB] has determined that governing the location of a new use is within the authority granted to the municipality under the Municipalities Planning Code. The **location of a use is within the authority of a zoning ordinance and is not pre-empted by the Noncoal [] Act or the Surface Mining Act**. Preemption occurs only when the zoning ordinance attempts to control the operational activity governed by a statute in the operation of the regulated activity. [The Township] may determine where a regulated activity takes place and this is the issue which is identified in the Notice of Violation.

(COL No. 10) (emphasis added).

Appellants had argued before the ZHB that the Notice was invalid because it was issued based on the 2002 Zoning Ordinance, but was issued at a time when that Ordinance was no longer in effect. On this issue, the ZHB concluded:

8. The November 2020 Notice of [V]iolation must be interpreted in accordance with the zoning ordinance in effect on the date of violation. The 2002 [] Zoning [O]rdinance was in effect at the time of the activity which is the gravamen of the [N]otice of [V]iolation.

(COL No. 8.)

Finally, the ZHB concluded that the Notice must be interpreted in accordance with the zoning ordinance in effect on the date of the violation, that the relevant ordinance is the 2002 Zoning Ordinance, and that the case before it was not moot because the activity addressed in the Notice was no longer occurring on

20

the Property. Here, the ZHB concluded that when the circumstances of a case are capable of repetition but could easily evade review, a court will proceed to address the merits of the claim raised. The ZHB observed that the Demonstration Permit does not expire until 2022. It further observed that Appellants had not exhausted their permitted capacity of 90,000 cubic yards of C&D fines at the Property and that Appellants could possibly request an extension of the time limits specified in the Demonstration Permit or could apply for other permits for the same use at the site. (COL Nos. 13, 14.) Lastly, the ZHB concluded that the Township and its Zoning Officer had satisfied their burden of proof to substantiate the violations described in the Notice. The ZHB therefore denied Appellants' appeal. (COL No. 21.)

### The Trial Court's Decision

Appellants appealed to the trial court, which did not conduct a hearing or receive additional evidence. The trial court issued its order and accompanying opinion on February 8, 2024, affirming the decision of the ZHB and dismissing Appellants' appeal. In its decision, the trial court held that the ZHB gave careful consideration to the evidence presented by the parties and reached a conclusion that was supported by substantial evidence and was not clearly erroneous. (Trial Ct. Order and Opinion (Trial Ct. Op.), 2/8/24 at 4-5.)

## II. Issues

On appeal, Appellants raise a large number of issues, which can fairly be combined and reorganized for ease of disposition as follows: (A) whether the ZHB abused its discretion or committed an error of law when it determined that Appellants' activities under the Demonstration Permit constituted both a sanitary landfill use and a manufacturing use, but did not constitute mine reclamation; (B) whether the Zoning Ordinance was preempted by the Noncoal Act; (C) whether a Notice of Violation issued under a repealed ordinance is valid and whether the case was moot; (D) whether the Township is barred from enforcing the 2002 Zoning

21

Ordinance due to a variance by estoppel or laches and whether Appellants' activities constitute the natural expansion of a nonconforming use; and (E) whether the ZHB demonstrated bias, created a hostile environment for Appellants or engaged in illegal *ex parte* communications.[16]

## III. <u>Discussion</u>[17]

"[I]t is well settled that a zoning hearing board's interpretation of its own zoning ordinance is entitled to great weight and deference. Such deference is appropriate because a zoning hearing board, as the entity charged with administering a zoning ordinance, possesses knowledge and expertise in interpreting that ordinance." *Kohl v. New Sewickley Township Zoning Hearing Board*, 108 A.3d 961, 968 (Pa. Cmwlth. 2015). "When interpreting zoning ordinances, this Court relies on the common usages of words and phrases and construes language in a sensible manner." *Hafner v. Zoning Hearing Board of Allen Township*, 974 A.2d 1204, 1210 (Pa. Cmwlth. 2009) (citation omitted). As this Court has recently stated:

> [A] zoning hearing board's function is to weigh evidence, and it is the sole judge of the credibility and weight of the

---

[16] One of the issues raised by Appellants need not be addressed by this Court. Appellants assert that the trial court erroneously employed an incorrect standard of review. However, "because we review the zoning hearing board's decision, we do not address arguments challenging the trial court's decision." *RDM Group v. Pittston Township Zoning Hearing Board*, 311 A.3d 1216, 1224 (Pa. Cmwlth. 2024) (citing *Pham v. Upper Merion Township Zoning Hearing Board*, 113 A.3d 879, 887 n.6 (Pa. Cmwlth. 2015)).

[17] "Where the trial court has taken no additional evidence, appellate review is limited to determining whether the zoning hearing board committed an error of law or a manifest abuse of discretion." *Hertzberg v. Zoning Board of Adjustment*, 721 A.2d 43, 46 (Pa. 2004). An abuse of discretion will be found only where the zoning hearing board's findings are not supported by substantial evidence. *Id.* Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* We "may not substitute [our] interpretation of the evidence for that of the ZHB." *Tidd v. Lower Saucony Township Zoning Hearing Board*, 118 A.3d 1, 13 (Pa. 2015).

witnesses' testimony. A zoning hearing board is free to reject even uncontroverted testimony it finds lacking in credibility, including testimony offered by an expert witness. We must view the evidence in a light most favorable to the party that prevailed before the zoning hearing board and afford that party all inferences reasonably drawn from the evidence.

*RDM Group v. Pittston Township Zoning Hearing Board*, 311 A.3d 1216, 1223-24 (Pa. Cmwlth. 2024) (internal citations and quotations omitted).

### A. Whether the Use of the Property Under the Demonstration Permit Constituted Manufacturing and Landfilling and/or Reclamation

The Township's Notice identified two specific new uses – manufacturing and landfilling – occurring on the Property for which Appellants had not obtained the required special exceptions and permits from the Township. In this appeal, Appellants assert that the activities taking place on the Property pursuant to its Demonstration Permit constitute mine reclamation, *i.e.*, activities which are regulated by the PA DEP and are not subject to the 2002 Zoning Ordinance. They claim that the Township is using its 2002 Zoning Ordinance to regulate surface mining and argue that the Noncoal Act specifically preempts any local ordinance that attempts to regulate surface mining. (Appellants' Br. at 9-11.)

We note, however, that Mr. Bellas testified that the PA DEP's demonstration "permit does not supersede local land use restrictions." (R.R. at Item 8, N.T. at 13).

### 1. Manufacturing

Appellants assert that the ZHB erred when it concluded that the mixing of C&D fines waste material from off-site third-party sources with cement and water constitutes "manufacturing" under the 2002 Zoning Ordinance which is not permitted in the S-1 Conservation Zone. They contend that the activity or use taking

23

place on the Property constitutes mine reclamation, not manufacturing. They further claim that mine reclamation is not subject to the Township's 2002 Zoning Ordinance because the Noncoal Act preempts local regulations that purport to regulate "surface mining" and "support activity." (Appellants' Br. at 20, 25.)

The ZHB determined that Appellants' use of the Property can be classified as manufacturing because the purpose of the process being carried out on the Property "is to create and test a product for its potential use in a variety of commercial applications." (COL No. 11.) It stated "[t]he new use of the Appellants produces a material which is designed to meet certain parameters for compaction, strength and permeability. This new product has been created for various applications." (COL No. 15.) Based on the record evidence, the ZHB found that the new use of Appellants' Property constituted a manufacturing use under the 2002 Township Zoning Ordinance. *Id.*

The Zoning Ordinance limits manufacturing to I-1 Zoning Districts and prohibits manufacturing in S-1 Conservation Zones. (R.R. at 9a.) However, the Zoning Ordinance does not define the term "manufacturing." (COL No. 15a.) This Court has stated that undefined terms are to be given their plain meaning. When required to review an undefined term in an ordinance, this Court has held that a reviewing court may consult definitions found in statutes, regulations or the dictionary for assistance. *H.E. Rohrer, Inc. v. Zoning Hearing Board of Jackson Township*, 808 A.2d 1014, 1017 (Pa. Cmwlth. 2002). Therefore, the ZHB properly consulted the Merriam-Webster dictionary when it found it necessary to define the term "manufacturing." The Merriam-Webster dictionary which defines "manufacturing" as "the act or process of producing something." (COL No. 15.) It also considered the North American Industrial Classification System's (NAICS) definition of manufacturing, which defines "manufacturing" establishments as "[e]stablishments engaged in the mechanical, physical, or chemical transformation

24

of materials, substances, or components into new products." *Id.* Based upon these two definitions, the ZHB concluded that Appellants' use of the Property pursuant to the Demonstration Permit constitutes a manufacturing use under the 2002 Zoning Ordinance. *Id.* It further stated that the purpose of the process being carried out by Appellants was "to create and test a product for its potential use in a variety of applications." (COL at 11.)

The ZHB also relied upon evidence presented to it during its hearings in concluding that the activity taking place on the Property constituted manufacturing. Such evidence included the testimony of Appellants' witness, Mark Popple, who testified that it was his understanding that the purpose of the Demonstration Permit was to demonstrate a new use and that he had not previously used the product being produced on the Property for mine reclamation.

It also included PA DEP representative Mr. Bellas' testimony wherein he agreed with the following statement: "So by bringing in this waste and mixing it with the Portland cement, in DEP's definition it creates a new product." (R.R. Item 8, N.T. at 87.) With respect to the possible uses of the new product, Mr. Bellas testified that "[t]he intent of the permit is to show that the proprietary product ReCrete can be utilized as a structural fill in reclaiming old mine pits for future development. It is also the intent to show that this material, ReCrete, can also be able to be used for construction landscaping products." *Id.* at 17.

Appellants' witness, Kathryn Murray, also testified that the production process for mixing the C&D fines with the other ingredients was not haphazard, but rather was controlled by a computer, which ensured the production of a consistent product. (S.R.R. at 15b, 37b.) The ZHB also heard the testimony of Mr. Shepstone, the Township's expert, who testified that in his opinion, the mixing of C&D fines, Portland cement, and water constituted a manufacturing process. (F.F. No. 21(D); R.R. at 8a.)

Because the activities occurring on Appellants' property are being carried out under a "demonstration permit," we conclude that those activities should be seen as part of the experimental phase of a manufacturing endeavor rather than the manufacturing of an established product. Record evidence supporting this conclusion includes a statement included in a letter from PA DEP's Regional Director, Michael Bedrin, to the Township, who stated that after the demonstration project was completed, a report would be submitted to PA DEP analyzing the effectiveness of the material "for reclamation and the environmental impacts of its use." (R.R. at 77a.) He further stated that the PA DEP report would help "to determine if the demonstration project was successful and whether or not the material can be beneficially used for similar projects elsewhere, **or potentially**, continuation of the project at the Simpson Quarry." *Id.* (emphasis added).

Based on the evidence of record and for the reasons discussed above, we conclude that the ZHB's finding that the activity being conducted on the Property constituted manufacturing under the Zoning Ordinance is supported by substantial evidence.

## 2. Landfilling

In its decision, the ZHB found that the activity being engaged in on the Property pursuant to the Demonstration Permit also constituted a "Solid Waste Disposal Area" or "Sanitary Landfill." The 2002 Zoning Ordinance provides that a sanitary landfill is "considered to be any facility devoted to the storage and/or disposal of solid waste pursuant to the regulations of the [PA DEP] governing such sanitary landfills." (R.R. at 160a.) Because it found that PA DEP regulations do not define the term "sanitary landfill," the ZHB consulted the Merriam-Webster dictionary definition of sanitary landfill. The Merriam-Webster dictionary defines a sanitary landfill as follows:

26

An engineered land burial facility for the disposal of household waste that is so located, designed, constructed and operated to contain and isolate the waste so that it does not pose a substantial present or potential hazard to human health or the environment. A sanitary landfill also may receive other types of solid wastes, such as commercial solid waste, nonhazardous sludge, hazardous waste from conditionally exempt small quantity generators, **construction demolition debris**, and nonhazardous industrial solid waste.

(COL No. 16) (emphasis added). After the ZHB determined that Appellants' new use of the Property constitutes a sanitary landfill, it stated that under the 2002 Zoning Ordinance sanitary landfills are not permitted in the S-1 Conservation Zone. (COL No. 21(C).)

In making this finding, the ZHB relied upon the testimony of Mr. Bellas of PA DEP, who stated that the permit granted to Appellants applies to municipal waste processing or disposal facilities that are based on a new or unique technology for processing or disposing of municipal waste. (F.F. No. 7.) The ZHB also found that C&D fines contain numerous waste products and that C&D fines were delivered to the site by waste transporting and processing facilities which paid a fee to deposit the material at Appellants' site. (F.F. Nos. 13, 15.) The ZHB noted that the Operation Plan, Phase II, of the Demonstration Permit classifies the type of facility being permitted as a "Construction/Demolition Waste Landfill." (F.F. No. 20.) In addition, the Township's expert, Mr. Shepstone testified that in his opinion, the new use was a "sanitary landfill" under the terms of the 2002 Township Zoning Ordinance. (F.F. No. 21(C).)

We find that evidence of record supports the ZHB's conclusion that the operations carried out by Appellants on the Property constitute a Solid Waste Disposal Area (Sanitary Landfill) which is regulated under the 2002 Zoning

27

Ordinance. First, we note that Appellants' activities on the Property are being carried out under the auspices of a PA DEP Demonstration Permit for a Solid Waste Disposal and/or Processing Facility and that the Permit was issued by PA DEP's Bureau of Land Recycling and Waste Management, rather than by its Bureau of Mining. (S.R.R. at 41b.) In addition, Mr. Bellas testified that the Demonstration Permit is governed under Section 271.501 of PA DEP's regulations which apply to "municipal waste processing or disposal facilities." 25 Pa. Code § 271.501. (R.R. at Item 8, N.T., 8/2/2021 at 10.) Mr. Bellas also testified on behalf of the PA DEP that "[t]he material that comes to the facility and is weighed through their scales prior to processing is a municipal waste," *Id.* at 10-11, and that he would "categorize this facility as a waste processing facility." *Id.* at 86.

Furthermore, the use being made of the Property fits the dictionary definition of a sanitary landfill relied on by the ZHB because it is "an engineered land burial facility" designed to "contain and isolate the waste so that it does not pose a substantial present or potential hazard to human health or the environment." This definition of sanitary landfill also specifically includes facilities that receive, *inter alia*, "construction demolition debris." (R.R. at 15a, 200a.) *See Mountz v. Columbia Borough*, 260 A.3d 1046, 1050 n.4 (Pa. Cmwlth. 2021) (stating that "[i]n ascertaining the common and approved usage or meaning of statutory language, a court may resort to dictionary definitions of terms left undefined by the legislature") (citing *Leventakos v. Workers' Compensation Appeal Board (Spyros Painting)*, 82 A.3d 481, 484 n.4 (Pa. Cmwlth. 2013)) (citation omitted).

In addition, Thomas Shepstone, whose testimony the ZHB credited, testified that the activity being carried out on the Property constituted the operation of a "Sanitary Landfill." (R.R. at 71a-78a.) Finally, we note that the Demonstration Permit itself defines "C&D Fines" as a waste material and that Appellants' witness testified that the operation generates income in the form of royalties for accepting

28

C&D fines from third parties. (S.R.R. at 4b.) Based on the evidence of record, we affirm the ZHB's finding that the use being carried out on the Property constituted a waste disposal area or a sanitary landfill in addition to constituting the manufacturing of a product.

### 3. Reclamation

In support of their argument that the use occurring under the Demonstration Permit is not a new manufacturing use, Appellants claim that the purpose of the demonstration project is to create a material which they are using to reclaim a mining pit on the Property. They argue that the purpose of filling a quarry hole on the Property with a mixture of C&D fines and 6% Portland cement is mine reclamation, even though the work is being done under a Municipal Waste Demonstration Permit. (Appellants' Br. at 17.) In Appellants' view, the existing PA DEP permits preempt the local zoning ordinance if that ordinance attempts to regulate a mining-related activity.

The ZHB rejected Appellants' argument that they were engaged in mine reclamation. (R.R. at 15a.) It found that the production of a lightweight concrete product at the site and the use of a Pre-Act pit with no reclamation obligations for testing this product was a use that was new to the site and that this use was distinct from the prior mining or quarry operations carried out on the Property. (R.R. at 15a-16a, 46a-47a.) Therefore, the new use did not constitute reclamation.

We note that Section 771 of DEP's Noncoal Act regulations defines "reclamation" as "[a]ctions taken to reclaim the area affected by surface mining activities as **required** by this chapter." 25 Pa. Code § 77.1 (emphasis added). Appellants, however, have not demonstrated or even claimed that the quarry hole into which the C&D fines mixture is being deposited is a mine that they have an obligation to reclaim. In fact, an email from Mr. Bellas of the PA DEP to Fell

29

Township included in the record states "[t]he pit being utilized for this demonstration project was mined prior to reclamation requirements. (this is a Pre-Act mining pit) There are no reclamation requirements for this pit in the mining permits." (R.R. at 190a.) There also was testimony before the ZHB that the area where the mixture was placed was not subject to reclamation obligations. (R.R. at 46a-47a.)

Moreover, the ZHB heard testimony from a mining engineer that he had never seen a mixture of 6% Portland cement and C&D fines used for mine reclamation. (R.R. at 223a.) Finally, Appellants' witness, Mr. Popple, testified that he had never used the material being produced at the Property to fill other mining pits in other areas of the state. (S.R.R. at 34b, 36b-37b.)

During the ZHB's hearings, some of Appellants' witnesses testified that the product being produced and tested under the Demonstration Permit was intended to be used as a material that might prove to be appropriate for use in mine reclamation. (S.R.R. at 16b, 23b, 36b.) However, they conceded that the material being produced has never been used for mine reclamation in the Commonwealth, (S.R.R. at 34b, 36b-37b), and the record evidence indicates that it is being deposited into a pit that has no reclamation obligations. (R.R. at 190a.) Finally, we note that the PA DEP representative stated that once the project is complete, a report will be prepared and submitted to PA DEP analyzing the effectiveness of the material "for reclamation and the environmental impacts of its use." (R.R. at 77a.) At the time this case came before the ZHB, such a report had not been prepared. Therefore, at the outset of the project, Appellants did not know whether the material they were depositing in the quarry hole on the Property was suitable for use in mine reclamation.

Based on this evidence, we find that the ZHB's determination that Appellants' activity on the Property is more appropriately described as landfilling

30

and manufacturing than as reclamation is supported by substantial evidence.[18]  As noted previously, "a ZHB's interpretation of its own zoning ordinance is entitled to great weight and deference."  *Hafner*, 974 A.2d at 1210.  We "may not substitute [our] interpretation of the evidence for that of the ZHB."  *Tidd v. Lower Saucony Township Zoning Hearing Board*, 118 A.3d 1, 13 (Pa. Cmwlth. 2015), particularly in a case such as this one, where the ZHB held hearings and considered extensive evidence over a period of 17 days.  Moreover, we must view the evidence presented in the light most favorable to the party that prevailed before the fact finder, including by giving that party the benefit of all reasonable inferences arising therefrom.  *Id.*

### B.  *Whether the 2002 Zoning Ordinance Was Preempted*

Appellants assert that the ZHB erred when it found that the Noncoal Act preempts the Township's 2002 Zoning Ordinance because the 2002 Zoning Ordinance regulates the activity of "surface mining."  (Appellants' Br. at 9.)

We begin with a review of the relevant principles of law.  "[T]he mere fact that the General Assembly has enacted legislation in a field does not lead to the presumption that the state has precluded all local enactments in the field;  rather, the General Assembly must clearly evidence its intent to preempt."  *Hoffman Mining Company, Inc. v. Zoning Hearing Board of Adams Township, Cambria County*, 32 A.3d 587, 593 (Pa. 2011).  There are three types of preemption:  (1) express, (2) conflict, and (3) field preemption.  *Id.* at 593-94.  Pennsylvania courts disfavor preemption except where "the Commonwealth has explicitly claimed the authority itself, or unless there is such actual, material conflict between state and local powers that only by striking down the local power can the power of the wider constituency be protected."  *United Tavern Owners of Philadelphia v. School District of*

---

[18] We note that this opinion does not prohibit Appellants from complying with any remediation efforts directed by PA DEP on the Property.

31

*Philadelphia*, 272 A.2d 868, 871 (Pa. 1971). Moreover, municipalities may impose restrictions that are in addition to, and not in conflict with, state regulations. *Hoffman*, 32 A.3d at 612.

The ZHB determined that the activities being carried out on the Property, as identified in the Notice and the evidence presented during the hearings, are new uses which commenced in June of 2019 and that these uses are not permitted in an S-1 Conservation Zone. (F.F. No. 15.) It further found that determining the location of activities that constitute new uses of a property within a township is within the authority granted to the municipality under the Pennsylvania Municipalities Planning Code (MPC)[19] and that doing so is not preempted by the Noncoal Act. (F.F. No. 10.) The ZHB stated that "preemption occurs only when the zoning ordinance attempts to control the operational activity governed by a statute in the operation of the regulated activity." *Id.* The ZHB then stated that the "[] Township may determine where a regulated activity takes place and this is the issue which is identified in the Notice of Violation." *Id.*

As an initial matter, we note that the Demonstration Permit issued to Appellants by PA DEP states:

> 10. Nothing in this permit shall be construed to supersede, amend or authorize provisions of any valid and applicable local law, ordinance or regulation, provided that said local law, ordinance or regulation is not preempted by the Pennsylvania Solid Waste Management Act, the Act of July 7, 1980, Act 97, 35 P.S. [§§ 6018.101-108] [] and Act 101, Municipal Waste Planning, Recycling and Waste Reduction Act, July 28, 1988 (53 P.S. §§ 4000.101[-104]).

---

[19] Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. §§ 10101-10202.

32

(S.R.R. at 44b.) Notably, possible preemption by the Noncoal Act is not mentioned.[20]

The MPC provides that "[z]oning ordinances, except to the extent that those regulations of mineral extraction by local ordinances and enactments have heretofore been superseded and preempted by the Act of May 31, 1945 (P.L. 1198, No. 418), known as the [Noncoal Act] . . . may permit, prohibit, regulate and determine . . . uses of land. . . ." *See* Section 603(b)(1) of the MPC, 53 P.S. § 10603(b)(1).

In *Warner Company v. Zoning Hearing Board of Tredyffrin Township*, 612 A.2d 578 (Pa. Cmwlth. 1992), this Court considered whether a local zoning ordinance that allowed quarry operations as a use permitted by special exception was preempted by the Noncoal Act. First, the Court examined whether Section 16 of the Noncoal Act preempted the ordinance. That section provides:

> **5. Local ordinances**
> Except with respect to ordinances adopted pursuant to the . . . MPC," [53 P.S. § 10101-10202] all local ordinances and enactments purporting to regulate surface mining are hereby superseded. The Commonwealth by this enactment hereby preempts the regulation of surface mining as herein defined.

52 P.S. § 3316. In *Warner*, this Court held that the word "supersede" refers to the displacement of something that already exists. *Warner*, 612 A.2d at 581. Therefore, we found that the Act did not "supersede" the ordinance because the Act predated the ordinance. With respect to preemption, the issue was whether the ordinance provisions were intended to regulate land use or whether they regulated "surface

---

[20] In addition, the cover letter conveying the permit to Appellants stated: "[p]lease note that the issuance of this permit does not eliminate the need to comply with all other applicable federal, state, or local requirements at the permitted site." (S.R.R. at 40b.)

mining operations."[21]  In *Warner,* this Court upheld the zoning ordinance's setback requirements and the designation of uses permitted by special exceptions because those were traditional land use regulations, rather than attempts to regulate "surface mining operations."  *Id.* at 617, 624.

In *Hoffman*, 32 A.3d at 591, our Supreme Court stated that "the General Assembly must clearly evidence its intent to preempt."  *Id.*  It also noted that "[w]here an ordinance conflicts with a statute, the will of the municipality as expressed through an ordinance will be respected unless the conflict between the statute and the ordinance is irreconcilable."  *Id.* at 594.  It further stated that "[w]e have also observed that this Court has 'traditionally given local zoning power great play[, and has] been reluctant to strike down a local ordinance in cases where a state statute does not directly and inherently conflict with zoning power.'"  *Id.* (quoting *City Council of the City of Bethlehem v. Marcincin*, 515 A.2d 1320, 1323, 1326 (Pa. 1986)).

Finally, in *Huckleberry Associates, Inc. v. South Whitehall Township Zoning Hearing Board*, 120 A.3d 1110 (Pa. Cmwlth. 2015), a property owner appealed from a trial court order affirming the zoning hearing board which determined that landowner's operation of a solid waste recycling facility violated the Township's zoning ordinance.  The landowner had operated a noncoal surface mine and quarry on the property from the 1950s until 1996, but discontinued mining and quarry operations in 2000.  *Id.* at 1112.  In 2012 and 2013, PA DEP issued two

---

[21] The Noncoal Act defines "Surface mining" as "[t]he extraction of minerals from the earth, from waste or stockpiles or from pits . . . by removing the strata or material that overlies . . . or other exposing and retrieving them from the surface, including, but not limited to, . . . quarrying and leaching and all surface activity connected with surface or underground mining, including, but not limited to, exploration, site preparation, entry, tunnel, drift, slope, shaft and borehill drilling and construction  and activities related thereto; . . . ."  Section 3303 of the Noncoal Act,  52 P.S. §§ 3303.

biosoil permits to the landowner which allowed it to build and operate a composting and biosoil-production facility on the property. The permit limited the materials that could be used in the production process and also stated that the resulting post-production materials could only be used for certain purposes. *Id.* The landowner paved over a substantial amount of land without applying for a special exception or obtaining a zoning permit to do so. The landowner also did not obtain a zoning permit to change the use of the property from a surface mine and quarry to a solid waste recycling facility, which is a non-permitted use in the district in which the property was located. *Id.* The township cited *Huckleberry Associates* for violations of the zoning ordinance.

In support of its argument that the ordinance was preempted by both the Noncoal Act and the Solid Waste Management Act (SWMA), the landowner argued that by issuing the Biosoil Permits, PA DEP had determined that the solid waste recycling operation derives from its prior surface mining and quarry activities. *Id.* at 1113.[22] The zoning hearing board nevertheless denied the landowner's appeal. The landowner appealed the zoning hearing board's denial to the trial court which affirmed the zoning hearing board. On appeal to this Court, the property owner again argued that its solid waste recycling operation derived from its prior surface mining and quarrying activities and that the process by which biosoils are produced is preempted by the Noncoal Act.

This Court disagreed for the following reasons. First, because the ordinance was enacted pursuant to the MPC, it is not superseded by the express

---

[22] Appellants also argued that their use of the Property under the Demonstration Permit was a natural expansion of the Property's prior, nonconforming use as a surface mine and quarry. (Appellants' Br. at 35.)

35

language of the Noncoal Act. *Id.* at 1114. Second, this Court determined that local land use ordinances may govern *where* a regulated activity takes place but not govern *how* such activity is conducted. *See Geryville Materials, Inc. v. Planning Commission of Lower Milford Township*, 74 A.3d 322, 325 (Pa. Cmwlth. 2013) ("[C]ase law differentiates local ordinances that directly regulate the operation of mines and those that regulate where the regulated activity can take place. Only the former are preempted . . . ."). This Court found that the ordinance at issue in that case regulated **where** a noncoal surface mine could be located within the township, but it did not regulate the manner in which such a facility was operated. *Huckleberry*, 120 A.3d at 1113-14. In addition, the Biosoil Permits received by the landowner expressly conditioned PA DEP's approval of the solid waste recycling facility on the landowner's compliance with applicable zoning regulations, as it did here. *Id.*

Because in the instant case, the Zoning Ordinance does not purport to regulate the activity of surface mining, but rather specifies *where* within the Township a surface mine can be located, we find no error on the part of the ZHB in holding that the Township Zoning Ordinance was not preempted by the Noncoal Act.

### C. Validity of the Notice & Mootness

1. Validity of a Notice based on
a Repealed Ordinance

Appellants assert, without citing legal authority, that the Township cannot issue a notice of violation citing sections of a 2002 zoning ordinance when a new ordinance has been passed prior to the date of issuance of the notice. They acknowledge that the Township had issued at least one Notice regarding the same violations while the 2002 Zoning Ordinance was still in effect. But they argue that

36

the Township's November 30, 2020 Notice was invalid because it was issued 28 days after the Township adopted a new comprehensive zoning ordinance,[23] and that the Notice cited the 2002 Ordinance rather than the new 2020 Zoning Ordinance in describing the violation. (Appellants' Br. at 28.) According to Appellants, "[i]f the Township had issued the November 2020 Enforcement Notice before the Board of Supervisors repealed the 2002 Zoning Ordinance such enforcement action could have continued." *Id.* at 30.

Appellee Fell Township[24] disagrees and asserts that in *In re Board of Commissioners of Cheltenham Township*, 211 A.3d 845, 855 (Pa. 2019), the Supreme Court held that pursuant to Section 508(4)(i) of the MPC, 53 P.S. § 10508(4)(i), when an application is filed for approval of a plat, the zoning ordinance in effect at the time of the application is controlling, even if such zoning ordinance has later been repealed. In addition, the Township argues, the *Cheltenham* Court found that consideration of a subsequent revised application is still to be reviewed under the previous ordinance rather than the new one. (Appellee Fell Township's Br. at 17.) Thus, Fell Township argues that because the original Notice was issued to Appellants while the 2002 Zoning Ordinance was still in place, the ZHB did not abuse its discretion or commit an error of law by finding that the 2002 Zoning Ordinance controls in the present situation. *Id.* at 18.

In its decision, the ZHB determined that

8. The November 2020 Notice of Violation must be interpreted in accordance with the zoning ordinance in effect at the date of the violation: *Whitpain Associates v. Whitpain Township,* 439 A.2d 1334 (Pa. Cmwlth. 1992). *In Re Commissioners of Cheltenham Township*, 211 A.3d

---

[23] The new Ordinance went into effect as of November 2, 2020. (R.R. at 69a.)

[24] Appellees in this case are the ZHB and Fell Township. The Township intervened in the case when it was before the trial court. (R.R. at 229a.) The Township filed a separate brief.

37

at 855. The 2002 [] Zoning [O]rdinance was in effect at the time of the activity which is the gravamen of the [N]otice of violation.

(COL No. 10.)

We affirm the decision of the ZHB in finding no error in the issuance of the final Notice under the Township's 2002 Zoning Ordinance. We note that the Township's November 30, 2020 Notice explained that it was issued to replace the Township's prior Notice which had been issued on January 16, 2020, while the 2002 Zoning Ordinance was still in effect. (R.R. at 199a.) The November 30, 2020 Notice explained that the earlier Notice had been withdrawn because the zoning officer who issued the Notice was no longer employed by the Township, and stated that "this enforcement [N]otice is being issued in place of the prior one." *Id.* We also note that, as the ZHB's decision pointed out, all of the activities discussed in the Notice occurred while the 2002 Zoning Ordinance was in effect.[25]

We further note that the rules of statutory construction apply to the interpretation of local ordinances as well as to the interpretation of statutes. *See, e.g.*, *Geerling Florist, Inc. v. Board of Supervisors of Warrington Township*, 226 A.3d 670, 676 (Pa. Cmwlth. 2020) ("Although the Statutory Construction Act of 1972, 1 Pa.C.S. §§ 1501-1991, is not expressly applicable to the construction of local ordinances, the rules of statutory construction are applicable to statutes and ordinances alike."). Section 1976(a) of the Statutory Construction Act sets forth the following rule of statutory construction:

---

[25] Appellants' activities cited as violations in the Notice began after PA DEP issued a Demonstration Permit to Appellants on September 21, 2017 which was good for a one-year term after the commencement of processing and placement activities. (R.R. at 52a, 86a.) The activities set forth in the Notice began on or about June 12, 2019, and continued for a period of approximately one year. (F.F. No. 18.) Thus the 2002 Zoning Ordinance cited in the Notice concerned activities that had concluded before the new 2020 Zoning Ordinance went into effect on November 2, 2020.

The repeal of any civil provisions of a statute shall not affect or impair any act done, or right existing and accrued, or affect any civil action pending to enforce any right under the authority of the statute repealed. Such action may be proceeded with and concluded *under the statutes in existence when such action was instituted notwithstanding the repeal of such statutes,* or such actions may be proceeded with and concluded under the provisions of the new statute, if any, enacted.

1 Pa.C.S. § 1976(a) (emphasis added). *See also Catholic Cemeteries Association of Diocese of Pittsburgh, Inc. v. Township of Pine, Allegheny County*, 794 A.2d 435, 438 (Pa. Cmwlth. 2002). Because the 2002 Zoning Ordinance was in effect at the time the action was instituted, *i.e.*, when the original Notice was issued, we affirm the findings of the ZHB on this issue.

## 2. Mootness

Appellants argue that the ZHB erred when it decided the case because the demonstration project had concluded by the time of the ZHB decision and therefore the issues raised before the ZHB were moot. (Appellants' Br. at 29.) In its decision, the ZHB stated "[i]f the circumstances of a case are capable of repetition but could easily evade review, a court will proceed to address the merits of the claim raised." (R.R. at 13a.) It then noted that Appellants had not exhausted the permitted capacity of 90,000 cubic yards of C&D fines at this site under the Demonstration Permit and that they had been able to obtain extensions from PA DEP to extend the time limits for depositing and mixing the fines with cement and water at the Property previously under the approved permits. In addition, the ZHB considered that Appellants were not precluded from applying for other permits to carry out the activities determined to violate the Zoning Ordinance at the 700-acre site. *Id.* at 13a-14a. Appellants assert in response that if they were to resume their activities, a

39

determination that those activities violated a now-repealed 2002 Zoning Ordinance would be meaningless. (Appellants' Br. at 29.)

The ZHB asserts that an actual case or controversy was present when the ZHB issued its decision, and is currently present, because Appellants deposited a product containing municipal waste into a quarry pit on their property in an S-1 Conservation Zone, without authorization and in violation of the 2002 Zoning Ordinance. It contends that the fact that the manufactured product was never removed from the quarry pit makes this a continuing violation of the Zoning Ordinance. (ZHB Appellee's Br. at 26.) Thus, while the activity may have stopped, "the harm is still in existence. There is a manufactured product which to this day exists on the [P]roperty." *Id.* at 27. The ZHB further states that the designation of the zone as an S-1 Conservation Zone continues to today, and thus a controversy still exists. *Id.*

As the ZHB recognized in its decision, the mootness doctrine is well settled:

> [T]he cases presenting mootness problems involve litigants who clearly had standing to sue at the outset of the litigation. The problems arise from events occurring after the lawsuit has gotten under way—changes in the facts or in the law—which allegedly deprive the litigant of the necessary stake in the outcome. The mootness doctrine requires that an actual case or controversy must be extant at all stages of review, not merely at the time the complaint is filed.

(COL No. 12.) In *Slice of Life*, our Supreme Court held that in a zoning case, "the cessation of the complained of activity . . . which violated a city ordinance, did not render the action challenging the ordinance moot." *Slice of Life, LLC v. Hamilton Township Zoning Hearing Board*, 207 A.3d 886, 896-97 (Pa. 2019) (citations omitted). There, our Supreme Court found that although the alleged violator of the

ordinance was no longer operating the business that was found to violate the ordinance, it remained a business incorporated in Pennsylvania and could open the same type of establishment in the future. *Id.* The Court further determined that given the significant amount of time that typically passes between a decision by a zoning hearing board and an appeal of a zoning hearing board's decision, such cases are capable of repetition but could easily evade review. *Id.*

We conclude that on this issue, the ZHB did not commit an error of law and that its conclusion of law on this issue is supported by substantial evidence. We agree that this case is not moot because the presence of a sanitary landfill in an S-1 Conservation Zone continues to violate the Township's Zoning Ordinance so that an actual case or controversy exists. Even if that were not the case, we would find that the exception to the mootness doctrine for situations capable of repetition yet evading review applies here as well because as noted by the ZHB, Appellants could resume their activities either by requesting an extension of their existing permit or applying for a new permit at this site. For these reasons, we find that the mootness doctrine is inapplicable in this case.

### D. *Variance by Estoppel, Laches, and the Natural Expansion of a Nonconforming Use*

#### 1. Variance by Estoppel and Laches

Appellants argue that they have not violated the 2002 Zoning Ordinance because they obtained a variance by estoppel as a result of the municipality's failure to enforce its Zoning Ordinance. They base this argument on the fact that the Township did not object to the activities Appellants have been engaged in on the Property, despite being notified of Appellants' application for a Demonstration Permit in 2016 by PA DEP. In addition, they argue laches should bar the Township from enforcing its land use regulations because the Township did not issue its Notice until November 30, 2020. (Appellants' Br. at 34.)

41

The doctrine of variance by estoppel applies "when a property owner . . . has maintained a use of property contrary to the zoning laws for a long period of time. As the term suggests, the theory provides protection for uses that are contrary to the zoning law, but in which the municipality has acquiesced." *Springfield Township v. Kim*, 792 A.2d 717, 721 (Pa. Cmwlth. 2002). A variance by estoppel is an unusual remedy and is granted only in the most extraordinary of circumstances. *Skarvelis v. Zoning Hearing Board of Dormont*, 679 A.2d 278, 281 (Pa. Cmwlth. 1996). Mere inaction in enforcing a zoning ordinance, without more, cannot support the granting of a variance. *Springfield Township*, 792 A.2d at 721 n.4. Likewise, mere knowledge of a violation of a zoning ordinance does not, in and of itself, prove that a municipality actively acquiesced in the use of the property.[26] *Anderson v. Zoning Hearing Board of Hampton Township*, 690 A.2d 1328 (Pa. Cmwlth. 1997).

To establish a variance by estoppel, the party seeking it must prove all the essential elements by clear, precise and unequivocal evidence. *Springfield Township*, 792 A.2d at 721. In this case, Appellants have offered no evidence to prove the required elements. In particular, they have not demonstrated that the Township either failed to enforce the ordinance for a long period of time or that it

---

[26] To establish a *prima facie* variance by estoppel, the property owner must prove:

    (1) a municipality's failure to enforce a zoning ordinance for a long period of time;

    (2) that the municipality knew or should have known of the illegal use and actively acquiesced in the illegal use;

    (3) reliance by the owner on the appearance of regularity that the municipality's inaction has created;

    (4) hardship created by cessation of the illegal use; and

    (5) that the variance will not be a threat to the health, safety, or morals of the community.

*Springfield Township*, 792 A.2d at 721 n.4.

actively acquiesced in the illegal use. The facts of record indicate that Appellants began to use the Property in a way that violated the 2002 Zoning Ordinance in June of 2019, (F.F. No. 18), and that the Township issued a Notice to Appellants on January 16, 2020. (R.R. at 199a.) In addition, "in those cases where we have granted a variance by estoppel, the municipalities have done more than passively stand by; they have committed some affirmative act, such as granting a building permit, which would reasonably lead a property owner to conclude that the proposed use was sanctioned under the law." *Springfield Township*, 792 A.2d at 722 (quoting *Skarvelis*, 679 A.2d at 281). Because Appellants have not shown that the Township actively acquiesced in Appellants' violation of the Zoning Ordinance, we find that their argument regarding the variance by estoppel issue is without merit.

For similar reasons, we find that Appellants have failed to prove that the Township has been guilty of laches. "For a party to prevail on the defense of laches, it must prove both inordinate delay and prejudice from that delay." *Springfield Township*, 792 A.2d at 721 (quoting *Richland Township v. Prodex, Inc.*, 634 A.2d 756, 761 (Pa. Cmwlth. 1993)). Here, Appellants failed to prove that there was an inordinate delay on the party of the Township.[27]

## 2. Natural Expansion of a Nonconforming Use

Appellants assert that the use now being made of the Property, which consists of taking in C&D fines, mixing them with concrete, and depositing the mixture in a pit on the Property, constitutes the natural expansion of a preexisting nonconforming use, which they claim their earlier mining activities to be. Appellants contend that because the Property had been used for mining activities at

---

[27] Indeed, to the extent that the Township did not immediately send a Notice upon learning of Appellants' use of the Property, such delay may have resulted in part from Appellants' own actions in applying for a use variance from the ZHB for their use of the Property and later withdrawing their application. (R.R. at 21a-23a.)

43

the time of the enactment of the 2002 Zoning Ordinance, their current production of reclamation materials is allowable. (Appellants' Br. at 34-35.) The ZHB rejected this argument, stating that "the creating of the lightweight concrete product produced at the site and the use of the Pre-Act pit for testing of this product for this use is new to this site" and, therefore, was not a nonconforming use at this site. (COL No. 19.) It also specifically concluded that "the previous existence of the quarry did not incorporate the identified manufacturing use" and that "the claim of a pre-existing nonconforming use was not established by the Appellants . . . ." (COL No. 20.)

We agree. Appellants' argument relies on the premise that the use being made of the Property under the PA DEP's Demonstration Permit constitutes mine reclamation. It also overlooks the fact that Appellants carried out their mining activities pursuant to a special use exception issued by the Township. However, the special exception granted to Appellants by the Township only allowed for the use of the site for quarry and surface mining. The activities allowed under the exception did not include having C&D fines delivered to the site by waste transporting and processing facilities, which then paid Appellants a fee to deposit the C&D fines at the Property based upon the tonnage deposited, as the ZHB found was occurring here pursuant to the Demonstration Permit. (F.F. No. 15; COL at 9, 10.) The ZHB correctly found that Appellants' claim that their use of the Property constituted a preexisting nonconforming use was not established by Appellants, who had the burden of proof on this issue. (COL No. 19.)

Therefore, we find that substantial evidence supports the ZHB's determination that the activities engaged in by Appellants constitute the use of the Property for manufacturing and testing a new product and the use of the Property as a solid waste disposal area (sanitary landfill). We affirm the decision of the ZHB and the trial court with respect to this issue.

44

### E. Ethics Issues

#### 1. Recusal

Appellants argue that "there was the appearance of bias by the Board" and that [t]he Board did not recuse itself when requested." (Appellants' Br. at 35.) However, in their brief, Appellants do not provide any facts about this supposed appearance of bias or any conflict of interest on the part of the ZHB.[28] "As a general rule, a municipal officer should disqualify himself from any proceeding in which he has an immediate or direct pecuniary interest." *Amerikohl Mining Inc. v. Zoning Hearing Board of Wharton Township*, 597 A.2d 219, 222 (Pa. Cmwlth. 1991). However, "[b]efore it can be said that a judge [or a ZHB member] should have recused himself, the record must demonstrate bias, prejudice, capricious disbelief or prejudgment . . . . If a judge [or ZHB member] thinks he is capable of hearing a case fairly, his decision not to withdraw will ordinarily be upheld on appeal." *Caln Nether Company v. Board of Supervisors of Thornbury Township*, 840 A.2d 484, 496 (Pa. Cmwlth. 2004) (quoting *Appeal of Miller & Son Paving, Inc.*, 636 A.2d 274, 278 (Pa. Cmwlth. 1993)). Because Appellants have failed to offer any evidence or specific allegation of bias, prejudice, capricious belief or prejudgment, we determine that the ZHB did not abuse its discretion or commit an error of law in its determination that recusal was not warranted.

#### 2. Hostile Environment

Appellants assert that the ZHB violated its obligation to provide a neutral site for their administrative hearings. Appellants claim that the ZHB created a hostile environment for Appellants' witnesses at a hearing because at a table where cups for water were kept, a picture of Mr. Popple's adult daughter, who managed

---

[28] Appellants specifically state that they do not seek a remand to a neutral hearing officer, but rather seek to have the Township reimburse Appellants for all expenses they have incurred in this matter. (Appellants' Br. at 35-36.)

Appellants' project and had testified at previous hearings but was absent from this hearing, was taped onto three containers over pictures of missing children. (Appellants' Br. at 40-41.) Once again, Appellants cite no legal authority for their claim and request no specific relief.

In response, the Township contends that there is no evidence in the record to show that any member of the ZHB actually saw the photograph and that it was only brought to the Board Members' attention by Appellants' counsel. (Township Appellee's Br. at 24.) They further contend that the photograph could have been placed on the table by a member of the public. *Id.* We find that by providing no proof that any member of the ZHB was involved in the incident raised by Appellants, they have failed to prove their allegation that the ZHB created a hostile environment for Appellants during its proceedings.

### 3. *Ex Parte* Communication

Appellants claim that the ZHB committed a due process violation when it held an *ex parte* hearing on December 8, 2018, to continue a previously scheduled hearing regarding Appellants' application for a use variance for the Property for which Appellants had received their Demonstration Permit. The Township notified Appellants of this hearing. (R.R. at 21a-22a.) However, Appellants did not attend the hearing, but instead sent a letter to the ZHB informing it that they would not be attending the hearing because they had decided to withdraw their application for the use variance. *Id.* at 23a-24a. At the hearing, the Chairman of the ZHB announced that Appellants' application had been withdrawn and that the ZHB would not need to continue the hearing to render a decision on Appellants' application. However, before formally closing the proceedings, the Chairman of the ZHB allowed individuals who were present at the hearing an opportunity to provide input if they wished to do so. *Id.* at 24a. At the close of the hearing, the Chairman announced that all of the testimony offered at that hearing would be entered into the record. *Id.*

46

at 57a.  Because Appellants were invited to the hearing and were properly notified of the date and time of the proceeding, we find that Appellants' allegation that the hearing constituted a due process violation has no merit.

## IV.  Conclusion

For the reasons discussed above, we affirm the February 8, 2024 trial court order.

_____
PATRICIA A. McCULLOUGH, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Clinton Properties, Inc. and
Pioneer Aggregates, Inc.,
          Appellants

        v.

Fell Township Zoning Hearing Board
and Fell Township

:
:
:
:
:
:   No. 283 C.D. 2024
:
:
:
:

## *ORDER*

AND NOW, this 3rd day of February, 2026, the February 8, 2024 Order of the Court of Common Pleas of Lackawanna County is AFFIRMED.

_____
PATRICIA A. McCULLOUGH, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Clinton Properties, Inc. and Pioneer :
Aggregates, Inc., :
               Appellants :
 :
       v. : No. 283 C.D. 2024
 : Argued: April 8, 2025
Fell Township Zoning Hearing Board :
and Fell Township :

BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
              HONORABLE STACY WALLACE, Judge
              HONORABLE MARY HANNAH LEAVITT, Senior Judge

<u>OPINION NOT REPORTED</u>

DISSENTING OPINION
BY SENIOR JUDGE LEAVITT         FILED: February 3, 2026

The Pennsylvania Department of Environmental Protection (DEP) has granted a permit to Clinton Properties, Inc. (Landowner) and its lessee, Pioneer Aggregates, Inc. (Pioneer), to test a process for reclaiming an existing mining pit. Fell Township (Township) issued notice of violation of the Township Zoning Ordinance,[1] asserting that the permitted demonstration project constituted a sanitary landfill or a manufacturing facility, which uses are not authorized in the conservation district, where the former open pit mining operation is located. Because the permitted demonstration project constitutes neither a sanitary landfill nor a manufacturing facility, the Township did not prove that Landowner's reclamation project violated the Zoning Ordinance. With respect, I dissent from the majority's decision to hold Landowner in violation of the Zoning Ordinance.

---

[1] ZONING ORDINANCE, TOWNSHIP OF FELL, LACKAWANNA COUNTY, PENNSYLVANIA, January 2002 (Zoning Ordinance).

The Township Zoning Hearing Board (Zoning Board) found that approximately 2.5 acres of Landowner's 700-acre property is being used as a sanitary landfill or as a manufacturing facility, which use is not allowed in the S-1 Conservation District (Conservation District). I address those conclusions seriately.

The Zoning Ordinance defines a sanitary landfill as "any facility devoted to the storage and/or disposal of solid wastes *pursuant to the regulations of the Pennsylvania Department of Environmental Protection [(DEP)] governing sanitary land fills*." ZONING ORDINANCE, §11.188; Original Record (O.R.), Item No. 3, at 11 (emphasis added). Instead of using the Zoning Ordinance definition of "sanitary landfill," the Zoning Board used a dictionary definition. This was error.

The Zoning Board noted, correctly, that the DEP regulations do not specifically define "sanitary landfill." However, DEP regulations define other types of "landfills" as follows:

> Construction/demolition waste landfill--A facility using land exclusively for the disposal of construction/demolition waste. *The term includes land affected during the lifetime of the operations, including, but not limited to, areas where disposal activities actually occur*, support facilities, borrow areas, offices, equipment sheds, air and water pollution control and treatment systems, access roads, associated onsite or contiguous collection, transportation and storage facilities, closure and postclosure care and maintenance activities *and other activities in which the natural land surface has been disturbed as a result of or incidental to the operation of the facility.*

> Municipal waste landfill--A facility using land for disposing of municipal waste. *The facility includes land affected during the lifetime of operations including, but not limited to, areas where disposal or processing activities actually occur*, support facilities, borrow areas, offices, equipment sheds, air and water pollution control and treatment systems, access roads, associated onsite and contiguous collection, transportation and storage facilities, closure and postclosure care and maintenance activities

MHL-2

> *and other activities in which the natural land surface has been disturbed as a result of or incidental to operation of the facility.* The term does not include a construction/demolition waste landfill or a facility for the land application of sewage sludge.

25 Pa. Code §271.1 (emphasis added). In short, the DEP regulations specify that a "landfill" is an activity that disturbs the "natural land surface." *Id*. That is not happening here because there is nothing "natural" about an abandoned mining pit.

Pioneer's demonstration project is being conducted "within the Clinton Strip of the Simpson Quarry operation." Reproduced Record at 86a (R.R. __). The project consists of mixing construction and demolition (C&D) fines and Portland cement, known as "Re-Crete," in an abandoned mining pit, which was left after the minerals were removed. *Id*. The project will not disturb the "*natural* land surface." 25 Pa. Code §271.1 (emphasis added). Rather, the project will restore the mined pit back to its "natural land surface" by reclaiming the mining pit. Because the demonstration project is not disturbing the "natural land surface," it is not "landfilling," sanitary or otherwise.

The DEP permit of September 21, 2017, was issued by DEP's Bureau of Land Recycling and Waste Management. R.R. 88a-89a. This supports Landowner and Pioneer's position that the permitted activity constitutes land reclamation, *i.e.*, "land recycling." Lest there be any doubt, DEP's Regional Director, Michael Bedrin, stated in his letter to the Township that the permitted activity was consonant with the Zoning Ordinance "because the project involves *the reclamation of an existing mining pit*." R.R. 75a (emphasis added). The letter expressly stated that "DEP does not consider this project to be landfilling[]" because it was approved "to demonstrate that [C&D] fines can be processed with Portland cement through a pugmill and *be utilized to reclaim mining pits to levels at which the mined areas can be redeveloped*." R.R. 76a (emphasis added). This is consistent

with what was stated in the DEP permit, which authorizes a maximum deposit of 90,000 cubic yards of C&D fines and will expire in one year. The experimental nature of the project does not undermine the position of DEP and Landowner that the activity is the reclamation phase of a lawful non-conforming, mining use. Even if the reclamation is not permitted to continue beyond the first year, a portion of the Simpson Quarry will have been reclaimed.

The Zoning Board focused on the testimony of Roger Bellas, a DEP employee, who stated that the DEP permit for the demonstration project was governed by a Department regulation, at 25 Pa. Code §§271.501-.506, which "applies to municipal waste processing or disposal facilities that are based on a new or unique technology for processing or disposing of municipal waste." Zoning Board Decision, Finding of Fact No. 7; R.R. 4a. The majority contends that Bellas' testimony supports the Zoning Board's conclusion that Landowner's use of the property constitutes a "sanitary landfill." However, Bellas also testified that "[t]he material that comes to the facility and is weighed through [Pioneer's] scales *prior to processing* is a municipal waste." O.R., Item No. 8, Notes of Testimony (N.T.), 8/2/2021, at 10-11 (emphasis added). He then clarified that "in the opinion of DEP," "the demonstration permit[ is] not a landfill permit." *Id*. at 18. He explained his view, in response to a question about "landfill capping," as follows:

> [Counsel:] And what's your understanding as to how [Landowner and Pioneer] were going to cap the landfill upon completion of the demonstration activities?
>
> [Bellas:] Well, again, I believe that it was a contingency plan that, depending on the results of the demonstration, there may be a need to cap the site, the demonstration site. And the materials that were proposed to cap the site were similar materials that would be used to cap a landfill.
>
> . . . .

MHL-4

[Counsel:] Mr. Bellas, . . . there's an under drain, there's a liner, the product's created on site, it's filled.  There's a drainage system around it to catch the leachate, a sump is in pl[a]ce, and then there would be two feet of soil and then it would be planted and seeded.  Is that your understanding?

[Bellas:] I believe so, yes.

. . . .

[Bellas:]  Again, without going back and reading everything - - I do know that there were some discussions with site personnel as to when that could occur.  I think that at the onset of the project there was some optimism, based on the bench scale testing that was done, that the project could be successful.  Depending on the project's success, there was a thought that a continuation of the project could occur there.

So I think it was discussed that maybe a cap wouldn't be necessary.  *Depending on the results of the demonstration, our evaluation of it, and whether or not it could be considered for continuation, the capping may not have to happen and how quickly that could happen.*  [] *[M]y recollection is that there was never a definitive timeline for capping.  There was always the idea that possibly it wouldn't have to be capped if the demonstration showed that it was a success, a completion of the mine reclamation could happen, because there wasn't a full completion of -- the 90,000 cubic yards, the one year time frame may not have necessarily completed the reclamation to the point at which they would have wanted it to be completed.  So that if the demonstration was successful and we could develop some type of further permitting maybe they wouldn't have to cap it. They'd just continue to place the mixture material to complete the reclamation.*

*Id*. at 27-29 (emphasis added). Notably, Bellas testified that he helped Bedrin, the Regional Director, write the letter to the Township, and he agreed with Bedrin's statement that the demonstration project was not landfilling. *Id*. at 61.

In sum, Bellas testified that the demonstration project at the Simpson Quarry was a mine reclamation project that involved waste processing; he did not

MHL-5

testify that it constitutes a sanitary landfill.[2]   Critically, Bellas did not consider the mixture material placed in the mine pit, "Re-Crete," to constitute municipal waste. *See* O.R., Item No. 8, N.T., 8/2/2021, at 10-11 (testifying that the material that comes to the facility and is weighed through Pioneer's scales *prior to processing* is a municipal waste) (emphasis added).  The Zoning Board credited Bellas' testimony.

At the expiration of the demonstration period, Pioneer will submit a report that would include a "chemical analysis of the C&D fines received at the site, chemical analysis of the material placed in the pit, [and] results of the testing conducted on leachate and stormwater sampling[.]"  R.R. 77a.  This report will determine whether this form of reclamation can continue.

The Regional Director's letter was admitted into evidence, but the Zoning Board ignored its existence.  It made no effort to rebut the conclusion of the Regional Director that the permitted activity involved the recovery of land, which, ironically, advances the purpose of a conservation district.

Likewise, the Zoning Board erred in finding that the demonstration project constituted a manufacturing facility.  The Township did not offer the entire Zoning Ordinance into evidence, and it is not available online.  Rather, the Township placed only excerpts of the Zoning Ordinance into the record.  *See* O.R., Item No. 3 (Exhibit T-14).  Somewhat suspiciously, Fell Township did not include Section 5.550, which appears to provide for substantive regulation on a manufacturing use and may have assisted in an explication of what the Zoning Ordinance meant by

---

[2] The majority cites Supplemental Reproduced Record at 3b-5b and the Reproduced Record at 41a for its position that Bellas testified that the permitted project constituted municipal waste processing.  *Clinton Properties, Inc. and Pioneer Aggregates, Inc. v. Fell Township Zoning Hearing Board and Fell Township* (Pa. Cmwlth., No. 283 C.D. 2024, filed February 3, 2026), slip op. at 27.  However, it appears that these pages do not include Bellas' testimony.  Reproduced Record at 41a reflects Gary Wilding's testimony, and Supplemental Reproduced Record at 3b-5b reflects Mark Popple's testimony.

"manufacturing." *See* ZONING ORDINANCE, Table 1; O.R., Item No. 3, at 4. Instead, the record includes only Section 2.100 and Table 1 of the Zoning Ordinance, which limit "manufacturing" to the I-1 Industrial District but offer no clue on what is meant by "manufacturing." ZONING ORDINANCE, §2.100; O.R., Item No. 3, at 1.

Because "manufacturing" is not defined in the Zoning Ordinance, the Zoning Board relied on the Merriam-Webster Dictionary and the Northern American Industrial Classification System (NAICS). The Merriam-Webster Dictionary defines "manufacture" as "the act or process of producing something." Zoning Board Decision, Conclusion of Law No. 15; R.R. 14a. The dictionary provides an example of this, namely, "[t]he *manufacture* of blood goes on constantly in the human body." MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster .com/dictionary/manufacture (last visited February 2, 2026) (emphasis in original). The human body's "manufacturing" of blood cannot be an activity intended by the Zoning Ordinance to take place only in the I-1 Industrial District. The NAICS defines manufacturing use as "establishments engaged in the mechanical, physical, or chemical transformation of materials, substances, or components into new products."[3] Zoning Board Decision, Conclusion of Law No. 15; R.R. 14a. Landowner is not engaged in the creation of "new products."

The Zoning Board erred in using overbroad and extraneous definitions of "manufacturing" that were not appropriate for this context, which is land use.

---

[3] In any case, NAICS is "the standard used by Federal statistical agencies in classifying business establishments for the purpose of collecting, analyzing, and publishing statistical data related to the U.S. business economy." *See* UNITED STATES CENSUS BUREAU, *North American Industry Classification System*, https://www.census.gov/naics/ (last visited February 2, 2026) (emphasis added). It is hardly likely that the United States would classify a mine reclamation project as a manufacturing business.

In *Board of Supervisors of Lower Providence Township v. Ford*, 283 A.2d 731, 733 (Pa. Cmwlth. 1971), this Court held that the township's zoning hearing board abused its discretion in refusing to include trucking as an "industrial manufacturing pursuit" under the township's zoning ordinance. In doing so, this Court stated:

> When the term (Industrial Manufacturing Pursuit) defines uses which are permitted, it is both permissive and restrictive. Without further limiting definition, the permissive nature of the phrase must be taken in its "broadest sense." [] On the other hand, any restrictive nature ascribed to the phrase must be taken in its strictest sense. []

*Id.* (emphasis added) (quotations omitted). Here, the Zoning Board has turned this principle on its head by choosing the broadest, not the strictest, definition of "manufacturing." Because the Zoning Ordinance does not allow "manufacturing" in the Conservation District, the term must be construed narrowly.

Prior decisions of this Court offer several definitions of manufacturing in the context of zoning. In *Linke v. Hilltown Township Zoning Hearing Board* (Pa. Cmwlth., No. 863 C.D. 2023, filed December 17, 2024) (unreported),[4] slip op. at 5 n.6, for example, the township's zoning ordinance defined "manufacturing" as "including the production, processing, cleaning, testing, and distribution of materials, goods, foodstuffs, and products including asphalt and concrete." In *Eby v. East Earl Township Zoning Hearing Board* (Pa. Cmwlth., No. 1618 C.D. 2007, filed July 16, 2008) (unreported), slip op. at 6 (emphasis in original omitted), the zoning ordinance defined "manufacturing" as "[t]he processing and/or converting of raw unfinished or finished materials or products, or of any combination, into an

---

[4] This unreported opinion is cited as persuasive authority pursuant to this Court's Internal Operating Procedures. 210 Pa. Code §69.414(a).

article or substance of a different character, or for use for a different purpose[.]" In *Equilibrium Equities, Inc. v. Board of Supervisors of Middlesex Township, Cumberland County*, 696 A.2d 260, 262 (Pa. Cmwlth. 1997), the zoning ordinance defined "general industrial use" as "manufacturing or storage uses which, because of their shipping, storage and other requirements, *should not be located in close proximity to residential areas*" (emphasis added). Here, the activity in question is located on 2.5 acres of a 700-acre property.

Because restrictions on land use must be applied strictly and narrowly, the Zoning Board erred in using the broadest possible definition of manufacturing. Rather, it is the narrowest definition of "manufacture" that is appropriate, and this would include the components of "distribution" and "shipping." *See Linke*, slip op. at 5 n.6; *Equilibrium Equities*, 696 A.2d at 262. Here, the mixing of the C&D fines will not result in a product that can be distributed but, rather, will be used to return an open mining pit to usable land.

When interpreting the terms of a local zoning ordinance, "any doubt must be resolved in favor of the landowner and the least restrictive use of the land." *Borough of Fleetwood v. Zoning Hearing Board of Borough of Fleetwood*, 649 A.2d 651, 657 (Pa. 1994). The Zoning Board ignored the actual language in the Zoning Ordinance and, instead, used the broadest dictionary definitions to conclude that Landowner's permitted activity constituted landfilling and manufacturing. This was error and an abuse of discretion.

I would reverse the Zoning Board's decision.

_____
MARY HANNAH LEAVITT, President Judge Emerita

MHL-9